Filed 3/19/14  In re C.V. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re C.V., a Person Coming Under the Juvenile Court Law. | H039230 (Santa Clara County Super. Ct. No. JV39450) |
| THE PEOPLE, Plaintiff and Respondent, v. C.V., Defendant and Appellant. | |

The juvenile court found appellant C. V. to be a ward of the court under sections 600 et sequitur of the Welfare and Institutions Code, based upon allegations that he robbed two other minors.  His chief contention on appeal is that the trial court erred by overruling a hearsay objection to testimony by a police officer recapitulating the reports of other officers concerning the conduct of two companions of appellant's who testified on his behalf at trial.  Appellant also contends that counsel failed to render effective assistance when he failed to lodge a further objection to this testimony on the ground that it violated his right to confront the witnesses against him under the Sixth Amendment of the United States Constitution.  We have concluded that although it was error to admit

this testimony over a hearsay objection, neither that error nor the posited ineffectiveness of counsel can be judged prejudicial by the applicable standards. Accordingly, we will affirm the jurisdictional order. However we will sustain appellant's objection to a condition of the dispositional order which prohibited his association with certain persons, on the ground that such a condition is wholly unsupported by the record.

## BACKGROUND

It is undisputed that in the late afternoon of August 9, 2012, Eric A. and Mark M. were approached by another youth who took cash from them under threat of physical violence. The only point of controversy at trial was the identity of the perpetrator, i.e., whether the victims had been robbed by appellant or by one Christopher G., who was one of appellant's three companions at the time of the offense.[1]

Thirteen-year old Eric A. testified that shortly before the robbery he and Mark M. had purchased some items in a sporting goods store. As they walked away from the store, they became aware of a group of youths walking behind them. The group consisted of appellant, who was then 17 years old; two other "teen-aged kids" around appellant's age; and "maybe . . . a 7 or 8-year-old." One member of the group, whom Eric A. identified as appellant, began talking to them. At first he asked them "regular questions," like which school they went to. But then he moved in front of them and began to ask "questions like if we had any money." By this time his companions had gone ahead without him. The robber first "asked us for everything in our pockets, then just our money." "He said, you know, if you don't give me your money, I'm going to punch you." He also told Eric A. that one of his companions had a knife, "and that he

---

[1] Because some of the participants have the same initials as others, we have included the first names of all six involved minors. We have regularized the spelling of some names to reduce the risk of disclosing identities. (See Cal. Rules of Court, rule 8.401.)

2

was going to take me to an alley and stab me." At that time Eric A.'s height was "like 5'1", 5'2"," whereas the robber was "bigger." Eric A. gave him "approximately 22 bucks," and Mark M. also gave him some money. The robber then ran down the street to catch up with his friends. When the four of them went into a guitar store, the victims called the police, who came to the scene. At some point Eric A. was taken in a patrol car to look at some possible suspects. He recognized appellant, and identified him to an officer.

Asked whether he "ha[d] any question in [his] mind of the person who robbed [him] that day," Eric A. replied, "Not really." Asked more specifically whether it was "even possible" that one of the "2 other teenagers present" could have been "the one who robbed you," he testified, "Not really. He was the biggest of them all." Asked who he was referring to, he said, "The man in the purple shirt," referring to appellant.

On cross-examination Eric A. was asked whether there were "2 boys who looked similar out of the group of 4," to which he replied "A bit," while adding that "the one in the purple shirt was definitely a bit more mature looking than the other." He recalled that the person who took his money had "spiky hair," but could not recall whether he was wearing jeans. Asked if he had told Mark M. (or perhaps a police officer) that the robber was wearing jeans, he replied, "I'm not sure. I think I remember that the one who was robbing us was actually wearing shorts, I think." He acknowledged that events had been "more fresh in [his] mind" on the day of the occurrence, and that "some of the details" were now "a little fuzzy." The detail of the robber's pants might "[p]ossibly" be one such detail. He remained confident, however, that the person who robbed him "had the spiky hair," while "the other person who kind of looked like" the robber "had flatter hair." He added, however, that it was only "[a] bit" flatter and that "they were even similar looking in the hair; just little differences." He also recalled that while both of the

3

youths wore black t-shirts, "they had different pictures on them." One shirt had "like small pictures on it," while "the one who robbed us had like this big like drawing on it."

Although Eric A.'s memory was "fuzzy" with respect to the circumstances of his in-field identification of the robber, he believed that the suspects were all seated near the store entrance except for the one he identified as the robber, who was "being talked to by the police." He testified that he took "quite a bit of time looking at him and the other people," but conceded that, "[a]t first," "it was confusing, because they looked so similar."

On redirect, Eric A. testified that police had "not exactly" "sa[id] anything to [him] that basically told [him] who to identify." They had asked him "if any of [the suspects] had looked like they had robbed me." Asked if they made "any suggestions . . . as to who you should pick out," he replied, "Not really. They just kind of, you know, point out like, was it—was it that person? Was it like— [¶] Q And you made the decision as to who it was? [¶] A Yes." Presented with two photographs depicting appellant and Christopher G., respectively, Eric A. testified that he was "pretty sure" the former was the robber. He concluded by agreeing that he was "positive in [his] identification today in court."

When defense counsel attempted to question Eric A. further about the degree of certainty in his identification, the court terminated the line of inquiry by sustaining an objection that counsel had misstated the witness's testimony and then adding on its own initiative, "I feel like we've been over this a time or 2. So if you have any other questions, please go ahead." Examination of the witness concluded with the following question and answer: "Q. (By Ms. Smith) I'm just trying to be clear with you, [Eric], if there's any question in your mind after looking at the 2 pictures and after having time to think about it as to which one. [¶] A. I actually do not. Because I remember that—

4

because I remember that one thing that I really noticed was the stress lines on his head (indicating)."

Mark M., also 13 years old, gave an account largely congruent with that of Eric A. He testified that there was a group of four people behind them—one who "seemed very young," one who "seemed older but still quite young," and two who "were a lot older but didn't seem like adults." One member of the group said hello and asked them what school they went to, where they lived, and what grade they were in. Mark M. and Eric A. answered these questions without stopping. They then "went to the bank," outside of which the group of four "went in front of us," except that "one of the them stopped and turned around and started . . . talking to us." He asked what they had in their pockets, to which they replied that they "d[idn't] want to tell him." Then he "said like, are you sure? We kept saying no. Then after awhile they [*sic*] said, Give me everything in your pockets." Mark M. identified appellant as the person who made that statement.

Asked if the person made any threats to him, Mark M. replied, "not . . . to me but my friend." He said, "I'm gonna punch you if you don't give me everything in your pockets. And another time he said, I'm going to drag you into an alley. And my friend there has a knife. And he'll stab you." Mark M., who was "scared," "gave him my wallet and my phone." The robber took $40 from his wallet, then returned the wallet and phone. The witness then corrected his testimony to state that he only "showed" the phone to the robber, who "didn't take it." The robber then rejoined his friends, who crossed the street and continued walking. The two victims followed them until they entered Guitar Center. At some point Eric A. called police.

After the police arrived, Mark M. was taken in a "police vehicle" to "take a look at possible suspects of the robbery." At that time he identified "the minor." Asked whether he had any doubt, as he sat in court, that appellant was the person who robbed him, he answered "No." Shown two photographs—presumably the same two already shown to

5

Eric A.—he identified the photograph of appellant as depicting "the person who robbed" him.

On cross-examination, Mark M. agreed that the person who robbed him had "spiky hair," as "opposed to the other guy who had flatter hair." The robber was wearing a black t-shirt, but the witness could not recall the design on it. The robber was wearing shorts, not jeans. On redirect, he testified that he did not recognize the t-shirt in the photograph of the person he had identified as the robber. He affirmed that he was "positive that the person who robbed you is the minor." None of appellant's three companions were involved in the robbery.

The prosecution then called Officer Wendy Hoskin, who testified that she was the "main investigator in the case and took the money record report." She interviewed one victim and conducted the in-field showup as to both victims. She conducted the two identifications separately. She first testified that Mark M. identified appellant without hesitation. He identified the other three detained youths only as the robber's friends. He identified the robber "by his face and clothing." Officer Hoskin then "drove him back to his parents." She then picked up Eric A. and took him to the scene of the detention. He too was "positive" in his identification, saying, "That's the guy who robbed us." He identified him by "his face, clothing and hair." Afterwards she drove him back to his parents.

The prosecutor then asked Officer Hoskin whether "any of the other kids," meaning the robber's companions, "attempt[ed] to talk to you about the case."[2] She

_____

[2] This testimony is curious because according to a supplemental police report attached to the petition, Christopher G. told officers at the time of the boys' detention that appellant had perpetrated the robbery. His statement is itself somewhat striking because it recapitulates in detail the conversation between the robber and the victims, even though the testimony at trial consistently indicates that the robber's companions had walked well ahead when the robbery took place.

replied, "No."  She gave the same reply when asked, without objection, whether "any of those kids that were present that day tr[ied] to tell the police, you've got the wrong guy." She likewise said "No" when asked, "[A]s far as you are aware, since you're the investigating officer in this case, has anyone since that date come forward to San Jose Police Department to indicate that there's been an error in identification?"

On cross-examination, Officer Hoskin testified that she had not searched the detained minors, although another officer had searched appellant at the scene and he might have been searched again at juvenile hall.  The stolen money "was never recovered."

The defense then called 11-year old Kevin M., who testified that it was Christopher G.—not appellant—who talked to the other two youths.  He did not hear what Christopher G. was saying.  He just kept walking with his brother and appellant.  At some point, Christopher G. caught up with them and showed them some money.  He had not had any money before talking with the other boys.[3]  They all then went to the Guitar Center, because Martin M. "needed to fix his guitar."  Inside the store, Christopher G. "flipped his shirt inside out."  When they left the store, they were "contact[ed]" by police. He was sure it was Christopher G., not appellant, who spoke to the boys; he had known Christopher G. longer, and was "more friends" with him.

On cross-examination Kevin M. testified that both appellant and Christopher G. were wearing black shirts.  He had known appellant since "like since last year," and Christopher G. "[l]ike since I moved in."  On the day of the robbery, he had seen appellant "getting arrested," which made him "feel bad."  However, he did not tell police

---

[3]  The police report states that after accusing appellant of the robbery, Christopher G. told officers he had not seen any money in appellant's possession, adding that in light of their failure to find it, appellant "must have hidden the money."  Nothing in the report suggests that officers asked Christopher G. for permission to search his person, or otherwise sought to do so.

7

that appellant was not involved. Nor did he "tell them any time later that [appellant] was really innocent and Christopher G. had done it." He testified on redirect that he did not know why he hadn't told police that appellant was not the robber. He had told a defense investigator the same thing he was saying today in court.

The defense next called Kevin M.'s brother, Martin M., whose age is not disclosed by the record. He testified that he was "sure" it was Christopher G., not appellant, who "went to talk to the 2 boys." He had just met appellant the day before, but had known Christopher G. for the better part of a year. It was Christopher G. he would consider his friend. After Christopher G. finished talking to the two boys and caught up with his companions, he showed them some money. He did not tell them how he had gotten it. Prior to his encounter with the other boys, however, he didn't have any money. When they got inside Guitar Center, Christopher G. "seemed like really panicked," and "was like in a hurry to like leave." He turned his shirt inside out. It was a black t-shirt with red details. At the time of the incident, "Christopher [G.] had like long, spiked up hair, while Charles had a short buzz cut."

Asked whether he said anything to anyone when he saw appellant getting arrested, Martin M. testified, "I told—I was going to the police. I told them like—I was going to tell them, but they didn't let me speak. [¶] . . . [¶] I was going to say that it wasn't—I was going to. Like, um, I was going to tell one of the police, but they told me to like be—to be quiet." Asked to describe "[e]xactly how did that happen," he said, "Like, well, because I was sitting down, because we—we were all sitting down in the—I was going to say, why are they arresting [appellant]? But I guess before I said anything, one of the police said not to speak." Cross-examination elicited the further details that the boys were sitting down outside the store, that about six officers were present, and that it was a male officer who told him not to say anything.

8

Martin M. was then questioned as to whether he had ever told police that they had arrested the wrong person, at which point he said, "No. Well, I did tell one. But I guess he didn't believe me." This led to the following exchange: "Q. You actually gave a statement to one that— [¶] A. Yeah. [¶] Q. —that Christopher [G.] was the person who did this? [¶] A. Yeah. [¶] Q. A police officer that day? [¶] A. Yeah." The only identifying detail he could recall about the officer was that he was white. Asked to explain why he didn't call the police afterwards to say they had the wrong person, he replied that he guessed they wouldn't have believed him because the victim had described the robber as a "tall, older guy" and appellant, whose height he guessed at six feet or six feet two inches, seemed to fit that description better than Christopher G., who was "like 5'6", 5'5"", and "looks like he's young."

Appellant then took the stand and testified that as he and his companions approached the other two boys, Christopher G. told them to slow down. After Christopher G. talked to the two boys, appellant did not see any money on him. Inside the Guitar Center, Christopher G. "started like panicking," and "wanted to go back home like as soon as he could." When he saw police cars outside the store, he went into one of the showrooms and flipped his shirt inside out. He and appellant were both wearing black t-shirts, but they had completely "different logos," in different colors. Appellant was wearing green shorts with "like stripes on them."

Upon leaving the store, the four boys were detained. Officers did not explain, but "told us that we knew why were getting detained." Asked whether he recalled Martin M. trying to say anything to any of the officers, he replied, "No. The police officer pulled me away from the rest of the group when they were talking to the rest of them."

Asked how long he had known his companions of that day, appellant replied that he had met Martin M. the day before the incident. He had met Christopher G. perhaps six years earlier, but appellant's family had moved away and then returned to the same

9

apartment complex, where Christopher G. was still living. Christopher G. was "like 2 years younger" than him, or perhaps a year and a half.

After the defense rested, the prosecutor again called Officer Hoskin to the stand for rebuttal. She testified that, as investigating officer, she was required to "take the main report, and . . . coordinate between all the other officers on all the reports." When other officers took statements from witnesses, they were to "advise [her] that they've done that." On that day other officers "did a field interview card on" Kevin M. and Martin M. "and had asked them if they knew what happened or had any statement." At this point defense counsel objected, stating, "Your Honor, I'm going to object as to hearsay." The court overruled the objection, adding, "I'll allow it. Go ahead." The witness continued, "Okay. [¶] When they did the field interview card, they asked them if they remembered what happened or if they saw anything, and they said, No. [¶] And the reason I know that is because when I went and contacted all the officers and collected all the field interview cards, I asked the officers, was there any statement from the 2 boys, [Kevin M. and Martin M.], and they said, No." On cross-examination, she confirmed that she was not present when the cards were filled out, and that when officers told her there were no additional statements, she had to take their word for it because she did not overhear anything.

The court then invited argument. The prosecutor argued that the "only" issue was "whether or not the court finds the victims in this case credible versus defendant's witnesses." Defense counsel argued that the conflicts in the testimony made it impossible to find beyond a reasonable doubt that appellant was the culprit. The prosecutor replied, "I think it does sort of stretch the imagination that the 2 witnesses who testified in court today never told anyone prior to—aside from a public defender investigator[—]that Charles was not the person who committed the robbery[,] and never bothered to tell any

10

police officer, not even gesticulate or say, hey, you've got the wrong guy with respect to the arrest that occurred on that day."

The court found that the allegations of the petition had been proven beyond a reasonable doubt. The court did not address the issue of identity at that time, but did allude to it at a later hearing when defense counsel requested a continuance in order to "request[] some changes to the charges." The court expressed a willingness to put the matter over, adding, "but that doesn't mean I'd be inclined to change the charges. I recall the trial and the testimony given very clearly. And I was quite persuaded by the testimony given by the young victims in the matter, as well as their very detailed identification."

Among the recommended conditions of probation was one prohibiting appellant from "knowingly associat[ing] with any person whom he knows to be, or that the Probation Officer informs him to be, a probationer, parolee, or gang member." Defense counsel moved to strike this condition on the ground that the record gave "no indication that [appellant] has a history or pattern of hanging around with other juvenile delinquents." Expressing the understanding that "these are standard orders" and "not full gang orders," the court denied the motion to strike. The court entered written orders declaring appellant a ward of the court and imposing the recommended condition, among others. Appellant filed this timely appeal.

## DISCUSSION

### I. *Hearsay*

The trial court clearly erred in overruling counsel's hearsay objection to Officer Hoskin's testimony concerning other officers' reports reflecting their questioning of defense witnesses and what those witnesses said, or did not say, to them. This recapitulation was "evidence of a statement that was made other than by a witness while testifying at the hearing and that [wa]s offered to prove the truth of the matter stated."

11

(Evid. Code, § 1200, subd. (a).)  It was therefore inadmissible unless it came within an exception to the rule against hearsay.  (*Id.*, §§ 1200, subd. (b), 1201.)  No exception was cited in the trial court, and respondent cites none on appeal.

Indeed, respondent's brief contains no coherent argument in defense of the trial court's ruling.  The closest it comes is to assert, "Hoskin's testimony was not introduced to prove the truth of the statement—that the brothers did not have any knowledge about the offense—but to establish that there was no record of the brothers giving any information to the police about what had occurred."  But this mischaracterizes the testimony.  When the objection was lodged Officer Hoskin had not merely been asked whether she knew of any record of a statement by the brothers.  She was asked to relate, as facts, matters heard, seen, and reported to her by other officers.  The officers who actually observed and interviewed the brothers would undoubtedly have been permitted to testify, by way of impeachment, to what the brothers had said, or failed to say.  But Officer Hoskin was in no position to give competent testimony on that subject.  She could attest only to what others had told her.  That is the form her testimony took:  First she alluded to "a field interview card" indicating that officers had asked Kevin M. and Martin M. "if they remembered what happened or they saw anything, and they said, no."  Then she testified that she had "contacted all the officers," and in the course of collecting the field interview cards, asked them "was there any statements from the 2 boys . . . , and they said, no."[4]

<hr>

[4]  The entire exchange is transcribed as follows:  "Q.  . . . Did anyone advise you that they'd taken a statement from any other witnesses that day?

"A.  Yes. Officer Daly took a statement—

"Q.  Uh-huh.

"A.  —From one of the witnesses.  [¶]  And I can't recall the officers.  About 6 or 7 of them there.  They did a field interview card on the M[.] brothers and had asked them if they knew what happened or had any statement.

This was, without question, pure hearsay.  Its admission over objection was plain error.  It warrants reversal, however, only if it "resulted in a miscarriage of justice." (Evid. Code, § 353, subd. (b); see Cal. Const., art. 6, § 13.)  "[A] 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error."  (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

We are unable to declare it reasonably probable that in the absence of the challenged testimony, the trial court would have reached a result more favorable to appellant.  This is not because, as respondent asserts, the evidence against appellant was "overwhelming."  On the contrary, the evidence as a whole offers many grounds from which a factfinder might entertain a reasonable doubt that appellant was the perpetrator of the robbery.  But the question before us is not whether another trier of fact, or we ourselves, might have reached a different conclusion on the evidence before the trial court.  The question is whether the error at issue—here, the admission of hearsay evidence that defense witnesses failed to make any contemporaneous statements exculpating appellant—is likely to have had an effect on the outcome.  For a number of reasons, we are unable to say that it did.

---

"Ms. Smith:  Your Honor, I'm going to object as to hearsay.

"The Court:  "Overruled.  I'll allow it.  Go ahead.

"The Witness:  Okay.  [¶]  When they did the field interview card, they asked them if they remembered what happened or if they saw anything, and they said, no.  [¶]  And the reason I know that is because when I went and contacted all the officers and collected all the field interview cards, I asked the officers, was there any statements from the 2 boys, the M[.] kids, and they said, no.

"Ms. Huntley:  Okay.  No further questions."

13

To begin with, the evidence was largely cumulative of other testimony and inferences to similar effect. The first defense witness, Kevin M., freely acknowledged that he had not told police, at the time of the arrest or at any later time, that the robbery had been committed by Christopher G. rather than by appellant. His brother Martin M. initially testified to the same effect, though he indicated that he attempted to speak to police but was told "to be quiet" or "not to speak." A few minutes later he testified that he "did tell one" officer but "guess[ed] he didn't believe me." He then affirmed that he "actually gave a statement" to one officer "that Christopher [G.] was the person who did this." He went on to affirm that he had made this statement to "a police officer that day," i.e., the day of the robbery.

It was this testimony that the hearsay recapitulated by Officer Hoskin tended most directly to impeach. But we see no reason to suppose that the trial court would have credited this testimony in the absence of the challenged hearsay. Martin M.'s testimony on this point appeared internally inconsistent, and could readily be perceived as evolving on the stand. He first said that he "was going to tell" police about their mistake, but "[b]efore I said anything, one of the police said not to speak." It was only a few minutes later, on cross-examination, that he said he had in fact given a statement to an officer, who he "guess[ed] . . . didn't believe" him. This is hardly the kind of testimony that was likely to inspire confidence in a trier of fact. Moreover the court could quite reasonably doubt that either Kevin M. or Martin M. *would* have volunteered that the police had the wrong youth, since doing so credibly would require them to incriminate Christopher G., who both said was a closer friend than appellant.

Further, the challenged testimony was similar in tenor and effect to testimony elicited from Officer Hoskin during the prosecutor's case in chief. At that time she was asked whether "any of the other kids," meaning the robber's companions, "attempt[ed] to talk to you about the case." She replied, "No." She likewise said "No" when asked,

14

"[A]s far as you are aware . . . , has anyone since that date come forward to San Jose Police Department to indicate that there's been an error in identification?"  No objection was lodged to either of these questions; nor does either appear objectionable.  She went on to affirm that none of "those kids that were present that day tr[ied] to tell the police, you've got the wrong guy."  That question might have been objected to for lack of a foundation in personal knowledge, since the witness's own testimony established that she was absent during much, if not all, of the encounter between officers and appellant's companions.  But no objection was lodged.  In any event we doubt this testimony was taken by the trial court as proof of anything more than that Officer Hoskin had heard of no statement by Kevin M. or Martin M.  That fact did not flatly prove that neither of them had made such a statement, but it supported an inference to that effect, since the court might quite reasonably suppose that any statement by either witness would have been communicated to her as investigating officer.  The court might also reasonably expect that any relevant statement by Kevin M. or Martin M., or any other witness, would have been recorded in writing—and that the writing would have been produced to appellant's counsel as a matter of routine obligation.  (See Cal. Rules of Court, rule 5.546(b) [requiring petitioner in juvenile court proceedings to "promptly deliver to or make accessible for inspection and copying by the child . . . or their counsel, copies of the police, arrest, and crime reports relating to the pending matter"].)  The manifest absence of any such writing was some evidence that no such statement had been made.

It is of course possible that Martin M. made an exculpatory statement to an officer who, in dereliction of his duties, failed to make any record of it and failed to mention it to the investigating officer.  But this possibility was only slightly diminished by Officer Hoskin's hearsay account of what officers actually told her.  Given that account, the officer in question would have had to be guilty of a further defalcation—affirmatively misstating the facts.  But we cannot credit the premise that the trial court's findings hang

15

by such a slender thread. The court undoubtedly believed that if any exculpatory statement had been made to any officer, that fact would have been related to Officer Hoskin. Her testimony that she was aware of no such statement was itself strong evidence that no such statement had been made. Her further, objectionable testimony—that officers *told* her no statement was made—was mere icing on the cake.

In essence the challenged testimony suggested the possibility that the testimony of the defense witnesses had been recently fabricated. Other evidence already before the court already supported such an inference, most obviously Officer Hoskin's testimony that she was aware of no statements by defense witnesses. The challenged testimony may have lent some marginal additional weight to that evidence, but it is difficult to believe that it could have been dispositive. Once the other evidence was introduced—in the form of testimony by Officer Hoskin that she had heard of no prior suggestion that appellant had been wrongly identified as the robber—the door was open to rehabilitative evidence by the defense, such as evidence that defense witnesses had in fact made prior statements consistent with their testimony, if not to police, then to someone. (Evid. Code, § 791, subd. (b).) In the absence of such evidence, the tendency of the entire record was to reinforce the substance of the testimony to which objection is made.

It thus appears to us that Officer Hoskin's recapitulated hearsay merely confirmed what the trial court was almost certain to find anyway, i.e., that the defense witnesses never raised an intelligible suggestion of misidentification until they were interviewed by a defense investigator some time after the incident. This did not compel a finding that their testimony was false. There might be many other explanations for a failure to volunteer their perceptions to police, including their friendship with Christopher G. But far from supporting reversal, that fact furnishes yet another reason to doubt that the challenged testimony played a significant role in the trial court's overall assessment of the case. The pivotal factor appears to have been the court's assessment of the relative

16

credibility of the prosecution witnesses and the defense witnesses. The trial court manifestly concluded that the prosecution witnesses were testifying accurately and that the defense witnesses were, for whatever reasons, testifying falsely. While another trier of fact might well have reached a different conclusion, we do not believe any trier of fact would be significantly influenced by Officer Hoskin's recapitulation of what officers told her, or wrote down on interview cards, concerning the failure of Kevin M. and Martin M. to assert appellant's innocence at the time of his arrest. We therefore cannot say that the erroneous admission of that recapitulation is reasonably likely to have affected the outcome.

## II. *Confrontation Clause*

Appellant also contends that the testimony was objectionable as a violation of his right to confront his accusers under the Sixth Amendment of the United States Constitution. (See also Cal. Const., art. I, § 15.) We need not determine the soundness of this premise because, once again, we are unable to conclude that the admission of the evidence could constitute reversible error under the governing standard of prejudice. Had a sound confrontation-clause objection to the testimony been made and overruled in the trial court, the error would be reversible on appeal unless we could declare it harmless beyond a reasonable doubt. (See *People v. Cage* (2007) 40 Cal.4th 965, 992, citing *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*); *id.* at p. 996 [dis. opn. of Kennard, J.]; *People v. Geier* (2007) 41 Cal.4th 555, 608 ["Confrontation clause violations are subject to federal harmless-error analysis under *Chapman v. California*[, *supra*, at p.] 24"].) But because no confrontation objection was lodged, appellant forfeited any associated claim of judicial error. (See Evid. Code, § 353, subd. (a); *People v. Geier*, *supra*, 41 Cal.4th at p. 609; *People v. Riccardi* (2012) 54 Cal.4th 758, 827, fn. 33.) Therefore the confrontation issue is cognizable on appeal only under the rubric of ineffective assistance of counsel.

17

A successful challenge on grounds of ineffectiveness of counsel requires a determination that (1) counsel's conduct "fell below an objective standard of reasonableness" under "prevailing professional norms" (*Strickland v. Washington* (1984) 466 U.S. 668, 688 (*Strickand*)), and (2) there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" (*id*. at p. 694). It is unnecessary to address the first question unless the record is sufficient to answer the second in the appellant's favor. (See *id.* at p. 697 ["[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . , that course should be followed."]; *People v. Price* (1991) 1 Cal.4th 324, 440.)

Respondent complicates things somewhat by supposing rather injudiciously that the test for reversible error in this context is that of *Chapman, supra,* 386 U.S. 18, 24, i.e., whether the admission of the challenged evidence was harmless beyond a reasonable doubt. This would indeed be the governing standard if the evidence had been admitted over a meritorious confrontation-clause objection. (*People v. Geier, supra,* 41 Cal.4th 555, 608.) But again, the absence of such an objection in the trial court precludes any appellate claim of evidentiary error as such. (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1028, fn. 19; *People v. Alvarez* (1996) 14 Cal.4th 155, 186.) It has been cogently suggested that the *Chapman* test should apply whenever counsel's unexcused omissions operate to forfeit important constitutional rights. (*People v. Mesa* (2006) 144 Cal.App.4th 1000, 1012-1015 (sep. opn. of Johnson, J.).) But such authority as we have found is to the contrary. (See *id.* at pp. 1009-1010 (maj. opn.), citing *Kimmelman v. Morrison* (1986) 477 U.S. 365, 374-375, 382, fn. 7, and *People v. Howard* (1987) 190 Cal.App.3d 41, 46-47.) We are therefore constrained, despite respondent's implied

18

concession, to apply the test enunciated in *Strickland*, *supra*, 466 U.S. at p. 694: whether appellant has established "a reasonable probability that, but for counsel's [posited] unprofessional errors, the result of the proceeding would have been different."

For reasons discussed in the previous part, we do not believe the present record satisfies this test. It is true that the identification evidence presented a close and difficult case. But we are required to focus on the effect of the posited error, which was to permit Officer Hoskin to relate matters beyond her personal knowledge, attributing them to absent witnesses. As we have said, the difference between the matters thus admitted and those otherwise established or suggested by the record appears too slight to sustain a conclusion that a different result might well have followed without the former.

We therefore affirm the jurisdictional order finding true the allegations of the petition.

### III.  *Probation Condition*

Appellant challenges a probation condition prohibiting association with gang members, on the ground that it is not reasonably related either to the crime he was found to have committed or to future criminality. The challenged condition states "[t]hat said minor not knowingly associate with any person whom he knows to be, or that the Probation Officer informs him to be, a probationer, parolee, or gang member." Defense counsel objected to this condition at the disposition hearing, stating, "I understand that given the fact that [appellant] was with Christopher I believe that's where the concern arises. However, there's been no indication that he has a history or pattern of hanging around with other juvenile delinquents. So I ask the Court to consider striking 13 as well." The prosecutor replied that the condition was justified due to "association with a co-part," whatever that means. The probation officer stated, "[I]t's actually a standard order. Anyone that's a ward on probation will receive [that condition]." The court

19

adopted the condition on that basis, stating, "I do understand these are standard orders. These are not full gang orders."

Appellant correctly asserts that the challenged condition has no demonstrated relationship to this crime, appellant's history, or any concrete risk of future criminality. The record fails to show any risk whatever that appellant may become involved in gang culture. He denied any "gang affiliation," and nothing in the record casts doubt on that denial. His mother reported without contradiction that "he ha[d] never presented any behavioral issues within the family home, and ha[d] not demonstrated a problem with drugs, alcohol, untreated mental illness, prior physically violent behavior, or gang affiliation." Indeed the probation report states that appellant "ha[d] reportedly never been in trouble with the law" and had "no other known delinquent referrals in Santa Clara County." Reports of his performance while released on an electronic monitoring program characterized his conduct as "exemplary" and "exceptional." The probation officer described him as "currently enrolled in an appropriate school program." The only explanation for the challenged condition appears in the report's concluding statement that "in view of the nature of the offense, and the delinquent status of the other minors [appellant] was with at the time of the offense, this Officer respectfully recommends [appellant] not . . . associate with others on probation, parole or gang members."

As this court recently reiterated, "When a probation condition 'lack[s] any reasonable nexus to . . . present or future criminality' [citation], there is 'no reasonable basis for sustaining [the] condition' [citation]." (*People v. Brandao* (2012) 210 Cal.App.4th 568, 574 (*Brandao*), quoting *In re Babak S.* (1993) 18 Cal.App.4th 1077, 1085.) The condition challenged there was identical in substance to the condition at issue here. It was undisputed that the condition had "no connection to the crime of which defendant was convicted." (*Brandao*, *supra*, at p. 574.) The pivotal question was therefore whether the condition was "*reasonably* related to a risk that [the] defendant

20

[would] reoffend." (*Ibid*.) This court concluded that it did not, and modified the condition to eliminate the reference to gang members.

We cannot blindly apply the rule of *Brandao* here, because that case concerned limitations on the power of a criminal court to impose reasonable conditions when placing an adult offender on probation. This case concerns the power of a juvenile court to fashion probation conditions in the best interests of a minor who has been adjudicated a ward of the court. The scope of the latter power may exceed that of a criminal court sentencing an adult. "The juvenile court's broad discretion to fashion appropriate conditions of probation is distinguishable from that exercised by an adult court when sentencing an adult offender to probation. Although the goal of both types of probation is the rehabilitation of the offender, '[j]uvenile probation is not, as with an adult, an act of leniency in lieu of statutory punishment; it is an ingredient of a final order for the minor's reformation and rehabilitation.' (*In re Ronnie P.* (1992) 10 Cal.App.4th 1079, 1089, 12 Cal.Rptr.2d 875, internal quotation marks omitted.) '[J]uvenile probation is not an act of leniency, but is a final order made in the minor's best interest.' (1 Cal.Juvenile Court Practice (Cont.Ed.Bar 1981) § 9.52, p. 256.)" (*In re Tyrell J.* (1994) 8 Cal.4th 68, 81, overruled on another point by *In re Jaime P.* (2006) 40 Cal.4th 128, 130, 139.) "In light of this difference, a condition of probation that would be unconstitutional or otherwise improper for an adult probationer may be permissible for a minor under the supervision of the juvenile court." (*Ibid*.)

It follows that a juvenile court might have discretion to restrict a minor's associational freedom on a lesser showing than would justify such a restriction with respect to an adult offender. Here, however, there was no showing whatever of any connection to gangs, past or prospective. The nearest the record came to suggesting such a connection was the probation officer's allusion to "the delinquent status of the other minors [appellant] was with at the time of the offense." But assuming that gang

21

involvement by a minor's companions would support a prohibition of the type at issue, "delinquent status" is not "gang involvement."

`Moreover, the record indicates that the court below did not really exercise any discretion with respect to the condition in question. The court indicated that it was imposing the condition, over appellant's objection, based upon its "understand[ing]" that such an order was "standard." The court also alluded to the fact that the condition was "not [a] full gang order[]," but that observation seems entirely beside the point. The question was not whether the record could support a more onerous restriction than the one imposed but whether it supported any restriction at all. The court expressly refused to address that question on the ground that the proposed order was "standard." Such a failure to exercise a discretion vested by law is itself a form of error. (See *In re Ronnie P.*, *supra*, 10 Cal.App.4th at p. 1091.)

The case is usefully contrasted with *In re Laylah K.* (1996) 229 Cal.App.3d 1496 (disapproved on another point in *In re Sade C.* (1996) 13 Cal.4th 952, 962, fn. 2, 983, fn. 4), where the court upheld gang-related prohibitions because the record showed a "history reflect[ing] increasingly undirected behavior" and the appellants "were clearly in danger of succumbing to gang pressures." (*Id.* at p. 1501.) Here the evidence suggested no gang pressure on appellant, let alone a danger of succumbing to it. Moreover the record does not show "increasingly undirected behavior" but one instance of lawless conduct in what otherwise appears to be a spotlessly virtuous record.

Nor does this case resemble *People v. Lopez* (1998) 66 Cal.App.4th 615, 623, where the defendant admitted his involvement with a gang but challenged the condition on the ground that there was no evidence the crime at hand bore any relationship to gang involvement. The imposition of gang-related conditions was held not an abuse of discretion in light of the defendant's "age, gang affiliation, and consistent and increasing pattern of criminal behavior." (*Id.* at p. 626.) Here, not only was appellant not a gang

22

member; there was no suggestion of any likely avenue by which he might become a gang member.

So far as this record shows, the gang condition had no relation whatever to appellant or to the crime he was found to have committed. The challenged condition must therefore be modified to omit any reference to gang membership.

## DISPOSITION

Condition number 13 (number 20 in the order of January 4, 2013) is modified to state: "That said minor not knowingly associate with any person whom he knows to be, or that the Probation Officer informs him to be, a probationer or parolee." In all other respects the orders appealed from are affirmed.


_____
                          RUSHING, P.J.



WE CONCUR:




_____
          PREMO, J.




_____
          MÁRQUEZ, J.


23